CLISBE AUSTIN *v.* CHARLES J. McKINNEY.

VENDOR AND VENDEE. *Title bond. Outstanding title.* When a party sells land, gives bond to convey but is unable to make title, the title being outstanding in a third party, and the vendee being in possession purchases the outstanding title, it inures to the benefit of the vendor, and the vendee is entitled to be repaid the amount so paid for title, not to exceed, however, the value of the land.

FROM HAWKINS.

Appeal from the Chancery Court at Rogersville. H. C. SMITH, Ch.

F. M. FULKERSON and S. J. KIRKPATRICK for complainant.

J. P. EVANS and J. B. HEISKELL for defendant.

FREEMAN, J., delivered the opinion of the court.

The facts necessary to the understanding of this case are substantially as follows:

Jno. A. McKinney, Jr., had received by will from his father a tract of land in Hawkins county. On the land was a mill site and mill. He and his brother, the defendant in this case, some years before the war, entered into a partnership in the mill, and put valuable improvements on the same, costing probably ten thousand dollars. They were equal partners in the mill and other property, but the legal title to the land was in Jno. A.

In 1862, the complainant negotiated with defendant

Austin v. McKinney.

Charles J. for the purchase of the land, and did so, at the sum of $10,500 in Confederate money, then worth about thirty-three and one-third cents in the dollar. This money was paid to defendant, who probably used his half of it. John A. was absent in the Confederate army at the time, did not authorize the sale of the land, nor know it had been made for some time afterwards. He never received any of the money paid for it. His share was deposited by respondent with a sister for safe-keeping, where it was consumed by the burning of her house sometime after the war.

Jno. A. McKinney, not being satisfied to ratify the sale made by his brother, commenced an action of ejectment to recover the land, the precise time when this suit was commenced not appearing in this record. This suit continued in court until the latter part of the year 1868, when the matter was settled between the parties, as appears clearly from this record, mainly through negotiations commenced and carried on by their respective attorneys, they consulting, however, with their respective clients.

The result of this was, that Jno. A. McKinney conveyed the land to a son of the complainant, Fred. M. Austin, for the sum of two thousand dollars, for which notes of one thousand dollars each were given, bearing interest from the 15th of September, 1868, payable in March and September after.

Complainant now brings this bill to recover the value of the Confederate money paid, on the theory that this was a simple sale to his son by McKinney,

and states that he had been advised by his counsel, it was impossible to resist the ejectment suit, and therefore consented to yield the possession of the land to McKinney's vendee. He goes on the idea, that when it was settled that the suit could not be resisted, the son proposed to him that he would buy the property, and that he consented to this, provided the son could buy from McKinney. He charges that he had no other concern with this, except to go security on the notes given by the son. He therefore assumes that, as Jno. A. McKinney had deprived him of the land purchased from Charles by superior title, his equity is to compel Charles J. to pay back the money received on the purchase.

The contention of defendant is, that the transaction was but a compromise between complainant and John A., by which John A. agreed to take from the father the $2,000 and dismiss his action of ejectment, the complainant paying the costs, and that the son was never heard of or known in the compromise until sometime after, when, at request of complainant, it was consented to by Jno. A. McKinney that the deed should be made to the son, his notes taken, with the father as surety, because the father had become involved in the State of Georgia in liabilities he was unwilling to pay, deeming them unjust, and, to this end, did not wish the title to appear in his own name. It is earnestly insisted that the whole matter was thus compromised, and so understood, and the original sale on these terms ratified, affirmed and completed.

To be more specific, we quote from the answer of respondent.  After stating the preliminary negotiations which led to the compromise between his brother and complainant, and that a request was made to name a sum that would be satisfactory, after conference with John by his counsel, John A. proposed, as the "property had actually cost over $10,000 in good money, the said Jno. A. McKinney regarding respondent as having *received* his one-half of . the purchase money— $5,000—and understanding that whatever sum should be finally agreed upon as a final settlement of the entire transaction, not only as between himself and complainant, but between all the parties, he authorized his attorney to accept $2,500, being only one-half of what his moiety of the property was estimated at in the trade, and one-half of what he had actually expended, aside from the value of the lands devised to him"—which, we add, was $1,500.

Further on he says: "The property contracted for was the real estate of J. A. McKinney, Jr., and the partnership improvements before spoken of, as before shown.  Counsel had agreed upon a sum as settling the whole controversy, and time fixed for the payment. McKinney had been informed of the terms, and, in deference to the wishes of his counsel, had agreed to accept the $2,000, which was to be paid in cash."

We now proceed to the solution of the questions thus stated.

We have carefully examined the facts in the record, and have no hesitancy in the conclusion that the theory of complainant, that the transaction was a sale to his

son, is not sustained. He and his son swear this most definitely, but the weight of the disinterested testimony most satisfactorily overturns this view. We need but summarize the reasons for this result.

A suit was pending between Jno. A. McKinney and complainant to recover the land. It is evident that what was done was a compromise of this suit. The proposition for a settlement came from respondent's counsel, as the case was hopeless as the law was then held in reference to contracts based on Confederate money. The testimony shows clearly that the suit was compromised, and that this settlement through their counsel was between John A. and complainant, and up to the time it was agreed on, and sometime after, the son had never been heard of nor his name mentioned in connection with it. After the terms had been agreed on, in which it seems the money was to be paid in cash, McKinney was informed by Austin that he could not raise the money to make the cash payment, whereupon he called on his counsel, Judge R. M. Barton, and informed him of the fact, and they agreed on other terms, to be submitted to him or his counsel, one of whom was the late Judge Thos. A. R. Nelson. In pursuance of this, Judge Barton, on the 14th of September, 1868, addressed a note to Judge Nelson, commencing by saying: "Col. McKinney was to see me on Saturday, and told me that Mr. Austin could not, as he alleged, raise the money in the time prescribed. I will alter the terms as to time. He will pay the costs of the suit, pay $1,000 in six months, and $1,000 in twelve months, both

bearing interest from the 15th of September, 1868." He then goes on to say, that "on complying with these terms he could have a title, or a deed for the land with a lien on the face of it; or a deed, he making a conveyance of the land to a trustee to secure the payment of the notes."

We stop here to say, that this note satisfactorily explains an apparent want of agreement between the testimony of the distinguished counsel whose statements are in the record, or rather the want of memory of the details by one, while the other seems to recollect them with more fullness. We think it clear that Judge Barton has stated correctly the substantial facts of the transaction. From this letter, we think it more than probable that he is mistaken as to which of the counsel of complainant the negotiation was had with, and that while he had talked with Judge Shields on the subject, the actual transaction was with Judge Nelson. This letter assumes, and evidently has for its background, the fact that Judge Nelson knew all about the matter, and had been the party with whom the compromise had been agreed. He does not explain or tell him what the subject of the letter was, as to previous terms, but assumes a perfect knowledge of them on the part of Judge Nelson, and on this basis proposes to alter what is assumed to have been heretofore agreed on between them, and submits the altered proposition in detail. It seems evident from the whole face of the letter that it was a matter well understood between them, and about which they had previously agreed.

But to proceed.   This letter, as well as the fact that the first deed submitted to McKinney for signature was to the father and not the son, shows conclusively, in connection with all the other facts, that the transaction was with the father, and a compromise of the matter of controversy, not a sale to the son.   The fact that he was to pay the costs of that suit as one of the terms of settlement, points significantly to this conclusion.

The question naturally occurs—why, then, was the deed made to the son and not to the father?   It is, however, as naturally and, we think, conclusively answered by the testimony of Judge Barton.   He says, in substance, that he met the complainant at some point, probably a railroad station, when he was on his way to some court, who took him aside and stated to him that he wished the deed made to his son, giving as a reason, that he had become involved in liabilities in the State of Georgia that he did not feel bound to pay, and therefore did not wish the title to the land to appear in his name.   Judge Barton told him that while his client, McKinney, would not make himself any party to an effort to defraud his creditors, yet he could see no objection to his making a deed to his son, or perhaps any one else, if he so requested it.   In pursuance of this request, no doubt, the title was thus made.

This disposes of the theory of complainant.   We come now to that of respondent.

Upon a most careful examination of the testimony, we are well satisfied that the *facts* are substantially

stated as we have quoted them above from the answer. They are, substantially, that John A. McKinney, when he returned from the war, feeling that he had not originally authorized the sale, and had never received any of the money paid, that the Confederate money had become worthless, and so he would get nothing for his property, determined to assert his legal title, and, as we infer from the testimony, probably purposed to use this as a means by which he should at least receive a portion of its value before he would part with the legal title.    He is shown to have said he "had complainant by the wrist," and intended to secure himself.    Under these circumstances, we think the only fair inference from the testimony is, that the transaction was a compromise of the litigation between John A. McKinney and complainant, by which, as stated by McKinney in his testimony, "the deed was made in settlement of the whole matter, and he agreed to ratify his brother's contract, and settle by compromise" the matter of difference between them at the time in consideration of the sum of $2,000 paid for his half of the property, his original offer being $2,500, one-half his estimate of its value.

That this was the actual transaction, we have no question.    But the serious question is, what inferences are we to draw from these facts, and what is their effect on the claim of complainant in this case?

Respondent insists that the effect of what was done is to entirely defeat any claim on the part of complainant against him, and that this compromise is to be held to include as part of its terms that complain-

ant was not in any way entitled to go on him for reimbursement for the loss sustained by him by having to pay the $2,000 in order to obtain title to the land and property which he had purchased and paid for, and for which he held the obligation of Charles J. to make him a title.   To this conclusion we cannot assent.

The matter settled was the contest between John A. McKinney and complainant.   The terms of the settlement were such as involved the payment of $2,000, accepted in lieu of $2,500, the one-half of the estimated value of what he claimed.   As John A. says, he ratified and confirmed the sale made by his brother in consideration of the $2,000 paid to him; and no doubt he did understand it settled the entire transaction between them, and all parties so understood at the time.   Their idea was, that Charles had sold but could not convey the title without John A. making the deed; but that he had received his pay for his share, and by the compromise complainant had it confirmed to him by a conveyance of the legal title. As to John A.'s share, complainant had to pay two thousand dollars in order to obtain it.   In other words, respondent sold the entire property, received pay for it, but is incumbered by a claim on the part of John A., as to one-half, which complainant has to remove by paying $2,000 for his title.

In reply to the argument and inference that this settlement was intended to settle complainant's right to recover for the loss thus sustained, by reason of his vendee being unable to comply with his contract

to make title, it need but be stated, that on the face of the contract nor by any of its terms is such an intention shown with any definiteness.   Such an inference is made by several witnesses, but the facts do not warrant it.

It was a settlement of a matter of difference with John A. McKinney.   So far as respondent is concerned, he was not a party to this settlement, is not named in it, nor is the contract he had made, so far as his own interest is concerned, in any way affected by it; nor was the obligation he had entered into annulled, or even sought to be annulled—on the contrary, it was distinctly ratified and affirmed..

We may add, as conclusive on this question, that in December, 1868, there was not a lawyer in Tennessee who believed complainant had any right to recover in our courts on a contract based on Confederate money as this was, or to recover back Confederate money or its value in any case.   It is clear, then, that the parties did not have in their minds a settlement of this claim presented in the present suit.

Assuming all this, the question is, what is the equity of complainant in this case?

He has purchased this entire property from respondent, has his obligation to make title, having paid the purchase money in Confederate notes.   The vendee is unable to comply with his obligation as to one-half the property; so that, by the ultimate settlement, he gets respondent's half by virtue of the contract, but, as to the other half, he is compelled to pay $2,000

in order to obtain what respondent had bound himself to give him.

On first impression, it might seem that the measure of complainant's right would be the sum he has paid to remove the incumbrance, and there may be some difficulty in reconciling the principle of our cases on the general question of the measure of damages in case of breach of covenants to make title, and on covenants of warranty in deeds conveying the legal title, especially in cases where the purchaser under a deed with warranty is compelled to pay off an incumbrance, and treats it as an eviction, and sues on the covenant of warranty for its breach. We need not go into this question, however, with that view.

It is stated in the case of *Shaw* v. *Wilkins, adm'r,* 8 Hum., 647, that on breach of an executory contract to convey land, the measure of damages is the value of the land at the time of the breach, to which a jury may add interest at their discretion. *See other cases cited in syllabus to Cooper's Ed.* It is said in the same case, that the measure of damages on breach of covenant of warranty in a deed is the purchase money with interest; and so the law is understood to be in our State.

The writer of this opinion has never been able to see the reason for the distinction in the two cases. In the case of breach of covenant to convey, the principle is, that the party is entitled to such damages as will make him whole, as if the covenant had been kept, and thus give him the same benefit as if the contract had not been broken; and the value of

the land is certainly the proper basis for this end. But why, when the breach is in the covenants of the deed after the land is conveyed, a party should not be reimbursed and equally have the full benefit of his contract, I am unable to discover. In the case cited, however, we may say the statement of the rule was a mere dictum of the learned judge delivering the opinion, the facts not raising the question; but we believe it has been generally recognized since that case.

Assuming the general rule to be as stated as to measure of damages, the apparent exception is, that if a vendee is in possession, either by deed or by contract to convey, and has not been evicted, but purchases in a better outstanding title, it inures to the benefit of the vendor, and all he can ask is to be reimbursed his outlay in obtaining the title, not exceeding the value of the land. *Searcy* v. *Kirkpatrick,* Cook's Repts., top p. —, C. Ed., and cases cited. That is this case. Complainant is entitled to be paid back this sum, to-wit, the $2,000, with interest from time of payment. If the parties can agree upon the time of payment, the decree can be entered here; if not, the case can be remanded for the account. The costs of this court and the court below will be divided between the parties.